Lanaghan v. Koch is the next case for argument. We are here today because my client, Mr. Lanaghan, was left in agonizing agony after he was hospitalized. He had a rare inflammatory muscle disease that causes painful eruptions on the skin and the destruction of muscle tissue. But he was so neglected that he had to be rushed to the hospital twice just to survive. Now, he sued the defendant at police for a violation of his Eighth Amendment rights for their appalling and deliberate indifference to his very serious medical needs. But we are not here today to talk about the merits of his claims. Instead, defendants want this court to affirm the dismissal of Mr. Lanaghan's meritorious claims because they say that he failed to exhaust his administrative remedies. Now, the defendants are wrong, and the district court was wrong, and here's why. The law is clear in the Seventh Circuit that an inmate is excused from the exhaustion requirement if the administrative remedies are not available for him to exhaust. It's a fact-intensive inquiry. It's done on a case-by-case basis, requires careful examination of all the circumstances surrounding the inmate's attempt to exhaust. And it's an analysis that this court has done many times in the past. So, the question is before you again today, did Mr. Lanaghan have administrative remedies available to him within the meaning of the Prison Litigation Reform Act? Now, Ms. Gutierrez, even if the denial of the use of the study table made it more difficult or even impossible for him to complete the grievance at that time, the prison officials neither misled him as to the need to file a grievance nor made him believe that he would not be allowed to do so. His failure to file it before the 14 days expired, it seems, was a product of his incapacitation due to his illness rather than the actions of the officials that made him unable to work with him during the restrictions on that particular day. Did you want to comment? Yes, Your Honor. Thank you. I think to address that question, and this is where I think the district court went wrong, is that the district court overlooked a lot of the facts relevant to that evening when he attempted to exhaust. And the relevant facts are that the Oshkosh policy was a two-step process for filing an administrative complaint. The first thing that prisoners had to do was to try to resolve the complaint internally, and then they had 14 days to file the complaint. And in this case, Mr. Lanaghan had already tried exhaustively the first step. He had gone to the health service unit multiple times, got no treatment. He complained to counselors and to social workers and prison guards, and he got no help. And that evening, after trying several times to resolve it internally, he did go to file a complaint. And he went to file a complaint with another inmate because he was in horrible condition. He was nearly incapacitated, as Your Honor noted. He could barely move. He couldn't eat or use the restroom or brush his teeth without assistance, and he needed that inmate's help him write. And so when he went there that evening, there was only one table available or one type of table available, and that was the study tables. Now, he informed the defendants that he wanted to write a complaint and that he needed to write the complaint. And those study tables, while the policy indicates they're for studying, the record is also clear that there was a lot of leniency with that rule, that guards had discretion to allow him to use that table, and in fact Mr. Lanaghan had used those study tables for purposes other than studying many times in the past. And it's also worth noting that the Oshkosh policy provided that inmates could help each other write complaints. It was on the complaint form. And so Wisconsin policy also supports that. I believe the regulation that I cited in my reply brief indicates that also that prisoners or prisons should allow inmates to help each other when needed to write the complaint. So knowing that Mr. Lanaghan was, excuse me, obviously in horrible condition and needing to write this complaint, and they had it within their power to allow him to do so, and they refused, that was an affirmative action by the defendants that prevented Mr. Lanaghan from exhausting his administrative remedies that evening. How that prevented him from doing something. The district judge said that it didn't prevent him because he just had to wait for an open recreation table. Why is that an incorrect understanding? Your Honor, that is incorrect because Mr. Lanaghan and his friend could not just wait around. It sounds simple to say it, but in that instance, not only was he in dire condition, in excruciating pain, exhausted, near death, but as I explained, it's on page 7 of my opening brief, he couldn't stand around and wait. The rules didn't allow for it. The rules in Oshkosh did not allow inmates to congregate around the day room. They couldn't wait around for tables and chairs to open up. Do you think that's well established in this record? I do believe so, Your Honor. I have the sites, like I said, on page 7 of my opening brief. I explain in detail some of the policies that prevented Mr. Lanaghan from just waiting around that evening. It's also in the record that after the defendant, seeing him in this condition and refusing to allow him to complete the complaint, that he gave up. He returned to his cell, and he prayed for death, and he was very close to dying. He was rushed to the emergency room a few days later  and that is why he couldn't try again after that evening. I believe that the law and the circuit supports that he didn't have to try again. He didn't have to try harder. I would point this court to the decisions in Dole v. Chandler and Swisher where in those opinions the courts rejected arguments that the inmate had given up too soon. I see that I have a couple minutes left. I would like to reserve that for rebuttal, if I may. Thank you, counsel. Mr. Keenan. May it please the court. Associate Attorney General Brian Keenan on behalf of the remaining defendant's appellees. The Pritizen Litigation Reform Act requires prisoners to exhaust their administrative remedies before bringing a suit in federal court. The district judge said all he had to do, all he and his assistant had to do was stand around and wait for an empty recreation table. And Ms. Gutierrez says that was forbidden. Must people do things that are forbidden, or is she wrong about that? They don't need to do things that are forbidden. However, it isn't forbidden to congregate in the day room. The day room is there for watching TV and doing things. It's not prohibited for Mr. Lanigan to stay in the day room beyond, if there's not a table available. So in the site she mentioned on page 7 as to the pay-to-hearing transcript, the defendant's own testimony, or the plaintiff's testimony, not to like a policy of the institution or anything of that sort. I think it's also important to note here that. Okay, we have what seems an important disagreement between counsel about what the prison's rules are. Where should we go to resolve that disagreement? What do you want us to look at? I would look at the evidence that was submitted at the pay-to-hearing transcript and the exhibits, and there's nothing. Not some set of rules? Normally to figure out what's required for exhaustion, we look at the written rules. Correct. Is there something you want us to look at? Yeah, well, and I think it's important to note that the rules in Wisconsin do not allow a place to be filed after 14 days, such that Mr. Lanigan was not. I will come to that. That's a different problem. But where do we go in the rules to figure out whether prisoners are allowed to wait for an open recreation table? I would look at Exhibit 1020 submitted at the hearing, which is the rules relating to the Oshkosh facility where Mr. Lanigan was. I don't believe there's anything in there that says the day room cannot, that an inmate cannot just wait in the day room for a table to come open. But I think it's important to note that the basis for the rejection of the complaint was not that the complaint was not filed on December 20th or around that time, but that Mr. Lanigan did not have good cause to wait all the way until July of 2012 to file his complaint. We're there now. What in the prison's handbook would alert an inmate that it was possible to file a belated complaint with good cause? Sure. The handbook reference says in its first section dealing with complaints says that the complaint processes is governed by Chapter 310 of the Administrative Code, and that's available for review in the library. So I gather your answer to my question is nothing. Nothing explicitly. The handbook says you must file in 14 days. Correct. And doesn't mention any possibility of exceptions for good cause. That's true. The handbook does not say good cause. I would point out that at the hearing ---- Have we ever required prisoners to go beyond a prison handbook to find out what the rules indeed require or allow? If the handbook says our system is you file in 14 days, what is it that would even lead a prisoner to think that there was some different deadline someplace else? I believe that the handbook is meant to be a short form, short reference book that can't have all the rules. I could imagine this argument if it said you have to file in 14 days, but there are exceptions. If you want to see what the exceptions are, go someplace else. But it doesn't say there are exceptions, does it? No, it doesn't. It just says you must file in 14 days. There's no hint about exceptions. So my question stands. Have we held in the past that a prisoner, looking at what appears to be a clear rule in the handbook, nonetheless has to go beyond it to the regulations, and if it's not the regulations, the statutes, and if it's not the statutes, the judicial decisions of the state courts? I'm not aware of that precise question being ruled on. I do know that the court requires the prisoners to follow the rules that are in the administrative code. I don't believe that a handbook is necessarily even required to have a handbook for prisoners to follow. I will note that the evidence in this case is not that Mr. Kline had read the provision on the handbook itself. He did not testify that he had even read that provision of the handbook or that he even had a copy of the handbook. He said he was vaguely familiar that there was a handbook. But he said that he actually ---- But here, on top of all that we've just discussed, although denying the use of a study table normally might not be an action that would render an administrative process unavailable. In this case, we have something added that we should take into consideration the fact that the prison officials could see that he was incapable of acting on his own, too weak to wait or return. And in that context, this is a forcible delay caused by the denial of the use of the table, the equivalent of a denial of the only avenue that was available to him to timely fire. No, I don't believe so. First, that the prison officials were not ---- they were just enforcing a rule of the prison system. They weren't committing any misconduct. And the case law generally requires either misconduct or at least complete hiding of the administrative process from the inmate where they don't even know it exists. Mr. Lanigan here clearly knew it existed and has filed numerous complaints over his, I believe, more than ten years in the prison system. Has he filed numerous complaints more than 14 days after the act being grieved? I don't believe so. Okay. So you don't ---- in saying that he's a frequent filer, you don't say that that shows knowledge that there is an exception to the 14-day rule? No, not that it would necessarily show he had subjective knowledge of that. But he wasn't ---- he did have knowledge of the complaint process generally. It does show that, unlike most of the plaintiffs in these other cases who had no idea that this complaint process even existed and therefore were not aware of any available remedy whatsoever. I do think it's a ---- When he filed those other complaints, was he in the dire condition that he was in this time? I don't believe so. I will say that when he eventually did file the complaint relating to the incident in this case, he began his complaint by pleading that he had good cause to waive the deadline. And so I believe that at that point he surely had notice of the rule and that it was not impossible for him to find out about the mechanics of the rule because he had obviously done so by the time he filed his administrative complaint, which asked for, you know, to excuse the late filing because he had good cause. That was ultimately rejected by Ms. Murphy, the complaint examiner, based on the reasoning which I think was recognized by this court in the recent case of Wilborn v. Ely that, you know, which dealt with a good cause requirement under Illinois' regulation, which is very similar to Wisconsin's, that a physical incapacitation would constitute good cause. That's what Ms. Murphy determined, but that he had delayed too long after returning to the facility in order to file his complaint. And as this court recognized in the Wilborn case that a prisoner would have to show, you know, cause for the entire delay and not just for a portion of the delay in filing the case. And so we think that shows that the administrative remedy was available to him. He just failed to meet the deadline, and that given the strict construction that the prisoner plaintiffs are required to meet all the deadlines in the prison administrative system, that this court should affirm the district court. Thank you, Mr. Keenan. Anything further, Ms. Gutierrez? Yes, Your Honor. Thank you. First, I just want to briefly follow up on the issue related to the handbook and the rules that Your Honor was questioning. Again, in my opening brief, pages seven to eight, I do describe several policies that made it difficult, if not impossible, for Mr. Lanigan to just wait around in the day room. And a lot of that information does come from his testimony at the Pavey hearing. Now, Mr. Lanigan had been an inmate at Oshkosh for several years. He knew the rules. He followed the rules. And that testimony was not contradicted by defendants when they testified, and it was not contradicted by defendants in briefing before this court. Further, I noted that counsel said that some affirmative misconduct is required by prison officials, and I think that that's incorrect. I think this court's recent decision in Weiss from last year, Weiss v. Barbo, explained that simply if a prisoner can't obtain or complete forms, his remedies are not available. And I posit that is exactly what happened in this case. Finally, I want to touch on this issue of what happened after Mr. Lanigan returned to Oshkosh after being hospitalized for nearly three months. Now, defendants want to hold Mr. Lanigan to a new rule that he should have filed either the day he got back or presumably within 14 days thereafter. But as this court noted, that was not in the handbook. That was not a written rule. And Mr. Lanigan knew the rules. Counsel explained it himself that he filed several complaints in the past. Well, apparently not all of the rules. He knew the rules that were in the handbook. He knew the rules that were in the handbook, and he followed those rules, and he followed those rules to a T. And he had filed complaints in the past within 14 days without incident. So he was relying on the administrative policy because he understood it, and he followed it in the past, and he did that. He tried to resolve it internally. He tried to file a complaint. He was prevented. And there's no law that says he had to try again. And so for that reason, we're asking this court to reverse the decision of the district court and hold Mr. Lanigan to the policy as it was written and not this new policy that defendants are trying to argue he has to follow. Thank you, Your Honors. Thank you, Counsel. The case is taken under advisement. Our final case of the day.